Your honors, I'd like to reserve two minutes for rebuttal. Good morning, your honors. Lisa Counters on behalf of the appellant Sean Shaughnessy. Mr. Shaughnessy has been diagnosed with Meniere's disease. That is something that is not disputed by any treating, non-treating, examining physician in the record. Both the state agency physicians and his treating physicians have confirmed that he has Meniere's disease. We think that the court made three errors in determining that Mr. Shaughnessy was not disabled. First, the court, the ALJ, gave great weight to the opinions of Dr. Shaughnessy's primary care physician, Dr. Opentaki, gave great weight to his opinion that he had, Mr. Shaughnessy, had work-related limitations, but gave minimal weight to the restrictions that Dr. Opentaki placed on him. And we think that the court erred in rejecting Dr. Opentaki's opinions without legitimate and specific reasons. The second basis of the error is the ALJ's failure to credit Mr. Shaughnessy's testimony, again, without clear and convincing reasons for doing so. What importance, if any, should I attach to the fact that Dr. Frank Opentaki is a primary care physician? There's a specialist to whom he was referred, Dr. Sims. Dr. Sims declines to provide any evaluation. So I'm not getting anything from the specialist. The only thing I'm getting is from the primary care physician. Correct, Your Honor. You're not getting anything from the specialist, though, not because he doesn't do medical legal work as part of his practice. So he would not prepare an assessment. Well, he says it's a general rule. He doesn't say that he never does it. Correct. But as a general rule in his practice, he doesn't provide medical legal work. I kind of smell in there, he doesn't really want to throw Mr. Shaughnessy under the bus. On the other hand, he doesn't really want to supply a record, an evaluation that would support the claim. Well, Your Honor, I think that that's extracting some, assuming or making some conclusions that I don't think are supported by the record. I don't know that every time a physician, a specialist says, I don't do, you know, I generally don't provide opinions about disability, that you can automatically assume then that the person is not disabled or doesn't have limitations. What we know from Dr. Sims is that he confirmed the diagnosis. He confirmed the sensory neural hearing loss. And they also confirmed that there's a caloric imbalance on the left side. He has left-sided veneers. So, you know, the primary care physician is in the position to see him. And there are a number of occasions, I think, when a primary care physician sort of supervises all the treating specialists and renders those opinions. I think it's difficult without further evidence to just assume that he was not wanting to throw him under the bus versus, you know, not wanting to render an opinion. In the climate that most claimants operate in today, it's, I mean, six of the major hospital chains in Arizona refuse to let their physicians provide any opinion. So, Counsel, can I ask sort of a different question? That is, his primary care physician that provided this opinion, initially, I guess, do you agree that his opinion was based pretty heavily on the claimant's self-reported symptoms? Not that, like you said, he verified that he had some of these issues. So, I'm not saying that he didn't have some objective evidence, but as far as the severity of him not being able to do the, you know, having these symptoms almost on a daily basis or at least, I think, maybe it's four times a week or something like that, that that was based on his, on what the patient had told him. I mean, in other words, the doctor wasn't following the patient around every day. So, I assume that that had to be based on what the patient had told him. Right, Your Honor. That is, in some respects, based on what the patient had told him. However, there are two ER visits where the symptoms became so bad that Mr. Shaughnessy needed to go to the hospital to have him treated. You know, I... He went to the emergency, that was when he went to the emergency room or... Correct. Okay, I think I remember. So, but I have a follow-up question to that because that was my understanding. It seemed to me like much of what the main doctor's sort of evidence of the severity of these symptoms is based on his self-reporting. So, there's a sense in which everything, including the doctor's testimony and the claimant's testimony, goes back to how credible the claimant's testimony is. And here's the challenge that I've got, and it's the driving thing. You know, the doctor is obviously telling him he shouldn't drive, presumably based on, you know, I think... I'm not a doctor, but if I had heard that this fellow was having the problems that he says he's having, I wouldn't think he should be driving either because I think he said he's having these kind of problems four days a week or something like that. So, you know, at any moment they could hit and you'd be... And yet, it sure appears like he was actually driving. So, he's driving, but he's telling the doctor something that's causing the doctor to tell him he shouldn't drive. And similarly, he's telling the doctor that, if I remember right, four days a week or three days a week, he can't even get out of bed, really, and get dressed. And yet, he's telling somebody that he's actually exercising. And I know there's kind of a dispute about what does exercising mean, but even if exercising is just that he exercises each day in a sense of walking twice a day, that also seems like it's kind of inconsistent. So, how is that not a basis for the ALJ, this sort of inconsistency between what he appears to be telling the doctor as far as what his symptoms are, but then driving and walking every day, even though that doesn't seem consistent with what he's telling the doctor? Right, Your Honor. And I understand your position, but if you limit it to just... If you talk about the frequency with which Mr. Shaughnessy suffers from the symptoms, he doesn't testify that every time he's out for 12 hours. He does testify and does admit that there are a few days a week that he doesn't get up and get dressed. With respect to the driving... How does he go for a walk then on those days, even if that's what the exercise every day meant when he talked about... How does he go for a walk? I believe the evidence is that he walks very close to the home with his wife when he... Without clothes on? You know what I'm saying? If he can't even get up and get dressed, then it's hard for me to think that he could go walking on those days. Right, and I think he testifies that he attempts to do that, and you have to understand he has other underlying conditions that we don't necessarily establish as disability, but he has diabetes, he has hyperlipidemia... But the other thing is he's telling his doctor stuff that's causing the doctor to say, you can't drive, but he is driving, and so you can see where that... It doesn't seem crazy to me for an ALJ to say, there's a disconnect here between those two things. I understand, Your Honor, but I think the only... First of all, the restriction on driving didn't come until after the evidence in the record that suggests he drove to the orthopedist's office. And I think that Mr. Shaughnessy's testimony is not that he drives all of the time, it's that on those limited occasions he's driven. And sometimes patients do things they're not supposed to do, but I don't think that overall ruins his credibility, especially when you consider the... No, but this is kind of important, because it is very possible that his symptoms... I suppose it's possible, let me say, that his symptoms are as bad as they are, and then he's putting the public at risk by disobeying what his doctor's telling him. That's possible. But it's also possible that his symptoms aren't as bad as what he's telling the doctor, and that's why he's feeling okay to drive. And if those two things are both possible, then we're in that situation where if the ALJ picks one view of the evidence, then we don't really get to second-guess that. Well, Your Honor, except that even... that I think is most critical for the analysis here is that when he has those symptoms, he's unable to work, and when he has an attack, it takes him a while to get back on his feet, and that he would lose focus and that he would miss more than four days a week of work. So even if you consider that, he's still not employable as a regular, consistent employee. And I've got a half-minute left, so I'll save that for Yvonne. Yeah, so we've taken you down to 30 seconds. Do either of my colleagues have any other questions? Okay, so we'll go ahead and we'll give you, for sure, at least a minute on rebuttal, and we'll go ahead and hear from the Justice Council. Thank you, Your Honor. Thank you. You may proceed. Good morning, and may it please the Court. Casper Chan on behalf of Kilolo Kijikazi, the Acting Commissioner of Social Security. This case is about the ALJ's reasonable comparison of the extreme limitations presented by both the claimant and Dr. Apong Thaki, and then, on the other hand, the unremarkable findings at the various treatment visits. Throughout the record, there's plenty of evidence that shows that claimant repeatedly denied many of the symptoms associated with Meniere's disease. These include tinnitus, vertigo, dizziness, and I direct the Court to page 17 and 18 of our brief, where we reference. . . Counsel, what about the argument that my understanding was that the claimant's argument is that he was denying them in the doctor's office at the time. You know, like he was saying, are you having tinnitus, right? How do you say that? How do you say it? Tinnitus. Tinnitus. Are you having that right now in the doctor's office during this appointment? He's saying no, but that doesn't necessarily mean that he's not having those symptoms. Sure, Your Honor. And I'd like to direct the Court specifically to what Dr. Apong Thaki stated in his opinion. On page 432 of the record, he indicates, he's asked, what's the average frequency of your patient's Meniere's attacks? He writes five times per week. He's then asked, how long does a typical attack last? About 12 hours. On the following page, it asks, how long after an attack do these manifestations last? Three hours. So we have 12 hours of attacks, three hours of these post-attack manifestations, and this occurs five times per week. And so I think it's reasonable. . . And one other point, I think he says up to 24 hours. Yes, Your Honor. And then at the hearing, a claimant testifies that sometimes the symptoms occur overnight. And so I think when we compare those extreme and dramatic limitations that are asserted by both the doctor and the claimant, and we compare that to the repeated denials, and while the treatment visits might only last, you know, say 20 or 30 minutes at a time, I think it's reasonable for the ALJ to have expected that, given both the frequency and duration that these symptoms were supposed to have occurred, that there would be more frequent documentation both of physical findings at treatment visits and then also of claimant raising these complaints at the treatment visits. And so just to echo what the Court had mentioned earlier, I think the ALJ reasonably found that there was a disconnect between both what the objective evidence showed and then what the assertions of both the doctor and claimant were. I'd also like to direct the Court, in addition to the objective evidence, one of the reasons that the ALJ identified in discounting the subjective complaints was claimant's work history. And so the ALJ raised two sort of sub-issues regarding the work history. One, that claimant was laid off for a business-related reason. He wasn't fired because of any difficulty performing the job duties. In fact, the claimant testified at the hearing that his former employer had hired two individuals, of which he was one, and they simply went with the other individual. And the second part of that issue is that claimant was receiving unemployment at the time, and I think it's notable that he testified at the hearing to a few things. One, that he was required to look for a job. Two, to affirm that he was available to work. And three, that he did, in fact, apply for jobs. And I think the ALJ reasonably found that claimant's alleged limitations of sudden and violent vertigo, he claims that the symptoms are occurring four to five times a week. I think the ALJ reasonably determined that his work history was inconsistent. So what's the timing on that? What year was he fired? I believe it was 2015, Your Honor. 2015. Now, that is before the onset date, isn't it? Yes, Your Honor. The onset date is 2016. Was he receiving unemployment into 2016? I believe he was receiving unemployment for six months afterwards. I'm not entirely sure what time period that covered. And the applications for jobs, was that in 2015 or was that in 2016, or later? It was part of his requirement for receiving unemployment. I'd also like to point the Court to Dr. Apontake's lack of specialty. As the Court had discussed with the appellant's attorney, Dr. Apontake is not a neurologist. He doesn't have any specialization in terms of Planoff's Meniere's disease, which is an inner ear disorder. And so I think the ALJ reasonably considered that the lack of specialty, in this case, was a relevant factor. The ALJ also noted that there was a limited treatment relationship between the doctor and claimant at the time that the initial opinion was prepared. And then at the subsequent time, where the second opinion affirming the 2016 one is prepared, there's a distinct lack of treatment to justify any sort of conclusion that the earlier limitations were ongoing. And unless the Court has any further questions, I'd just like to conclude by saying the Court should take notice of the repeated denials by Planoff of the relevant symptoms. It's a relatively short record in this case, and Planoff repeatedly denies these symptoms, and that clearly contrasts with both the treating physician and claimant's extreme and dramatic limitations. And thus we would ask this Court to affirm the ALJ's decision. Thank you, Counsel. We'll go ahead and return for rebuttal to Appellant's Counsel. I think we have a minute for you. Thank you, Your Honors. I want to address the lack of the discussion that Counsel made regarding no evidence in the record. I think Your Honors addressed it earlier, that he wasn't suffering from an episode at the time he was at the physician. But what the Commissioner can't deny, and what Dr. Opentake knew, is that he had confirmed sensorineural loss bilaterally, worse in his left ear. He had the confirmed caloric imbalance that's required for the diagnosis. Yeah, that's all true, but I think the government's position is sort of twofold. One is, given how often this was supposedly happening, you'd think the number of times he visited different doctors, there would have been a time or two when he was actually at the doctor and had the symptoms, given that it was happening five days a week, 15 hours a day to more. And then I guess the other thing, it seems like he would have, he may have said, no, I'm not having this symptom right this second, but boy, I'm having it five days a week. There would be something in the record. I would think that if that was going on with me, that would be front and center of something I would have reported to the doctor and made it into the record, even if it wasn't going on at that moment, if it was happening that severely. What is your thought about that? Well, I think that there is evidence that he complained of those problems in the record, that he suffered from the nausea and, in addition, the tinnitus, or tinnitus, depending on how you say it. I know, but I think the argument is that if it was going on this much, it would be in there more, I think was what the ALJ, it's in there some, but there's a whole lot of not mentioning it at all, and that does seem a little odd if it was going on that much. Well, I think if you look at the record, the specialist, Dr. Sims, spent quite a bit of time initially on diagnosis, explaining what the options were and what the treatment could be, and he tried in these limited options, and there really wasn't anything more he could do other than what he was doing, taking the meclizine, taking the anti-nausea medication when appropriate. He tried the injections, and so I think that the record is consistent with him making those complaints, but there wasn't anything more anybody could do for him except provide the medication. Okay. Do either of my colleagues have any further questions? No. All right. Well, thank you to both counsel. It's been very helpful this morning. Thank you, Your Honors. The motion will be submitted as of this morning. We have one more case for argument.
judges: FLETCHER, BYBEE, VANDYKE